**WOODSON, Plaintiff-Appellee, v. MIAMI SAVINGS AND LOAN COMPANY, Defendant-Appellant.**

Ohio Appeals, Second District, Montgomery County.

No. 1751.   Decided March 27, 1943.

Marshall and Marshall, Xenia, for plaintiff-appellee.

Mason Douglass, Dayton, for defendant-appellant.

## OPINION

By BARNES, P. J.

The above entitled cause is now being determined de novo by reason of defendant's appeal on questions of law and fact from the final judgment of the Court of Common Pleas of Montgomery County, Ohio.

Plaintiff in her action asked the court to declare and adjudge that the $4429.49 evidenced in account book No. 20383 in excess of $500.00, to-wit, $3929.49 to be a deposit account, and that the defendant be ordered to correct its records accordingly and issue to plaintiff a certificate of deposit in said amount, with interest from June, 1931, and for all other necessary relief in equity.

The defendant filed an answer among other things deny-

ing that any part of the deposit of $4429.49 was a deposit account, and alleging further that it was at all times and is now a running stock account. The prayer of the answer was that the petition be dismissed. The answer contained other defenses separately numbered.

Plaintiff filed a reply, and thereby the issues were joined, clearly raising the question as to the status of the account.

The trial court, after hearing the evidence, oral arguments of counsel and considering briefs, found for the plaintiff and ordered that the records of the defendant company be corrected so as to show the sum of $3929.49 a special deposit account.

The trial court based his conclusions largely, if not entirely, on the decision of our court pronounced in the case of **Busch v Wagoner,** Supt., et al., decided January 29, 1941, and reported in **Ohio Law Abstract, Volume 34, page 586.**

Counsel for the respective parties in our court present very able and comprehensive briefs and argue pro and con the proper construction to be placed on our decision in the Busch case, supra.

At once it becomes obvious that we must carefully examine the factual questions in the instant case, as well as the reported case in order to arrive at a conclusion determinative of the case at bar.

In the Busch case, supra, counsel in their brief refer to the numerous cases which we had previously decided where the relief sought was identical to that in the instant case. We said then and repeat now: "While there are certain similarities in some of the facts yet no two cases are identical on the factual questions. It naturally follows that each case must be determined upon its own particular facts."

As far as the evidence discloses plaintiff's decedent's first business relation with the defendant was April 10, 1922, at which time he subscribed for five shares of stock, and on the same day there was issued to him a pass book, upon the first page of which appeared the following:

"Miami Loan and Building Ass'n
Dayton, Ohio
Running Stock No. 16582
Geo. F. Woodson
Wilberforce, Ohio
Shares_____ Amount $_____
Date of issue April 10, 1922."

On the first blank page designed for entries of deposits, and at the top of the page, in rather heavy type, appeared the following: "Running Stock No. 16582".

The first entry in the book was on the same date, April 10, 1922, and on the same line in the column designated "payment" appeared the figures 100. Presumably this book was in the possession of decedent during his lifetime, the executrix producing it and introducing it in evidence as Plaintiff's Exhibit 2, when the case was heard in the Common Pleas Court. This book, Plaintiff's Exhibit 2, presents evidence of continuing deposits at irregular periods until July 11, 1929. There also appear in the account entries of dividends, dated June and December, through the various years, and fifteen in number. Balances were struck following each dividend payment. The top of each page, five in number, showed the balance carried forward. From the time of the opening of the account there appeared only one withdrawal. This was on January 10, 1929, in the sum of $40.00. The dividends above referred to, fifteen in number, in each instance following the amount, showed the designation "Div.". The last entry on page 4, at the bottom of the page shows the balance on the deposit, under date of July 11, 1929, to be $3900.00. This amount is carried as a balance to the top of page 5, and there, under date of December 31, 1929, appears $116.16 Div. The account was then totalled, at $4016.16, and thereunder is stamped "Cancelled. Miami Savings & Loan Co. Dayton, Ohio." A number of blank pages follow the last entry on page 5.

A new book was issued in 1930, the first entry in which is dated June 30, 1930, and shows a new balance of $4136.64. At this date the dividend was entered in the amount of $120.48, which added to the balance in the first book, equalled the balance entered in the second book. This second book, marked as Plaintiff's Exhibit 3, contains only three additional entries, two of which were dividends and another, under date of May 28, 1931, a deposit in the sum of $62.00. The final entry is dated July 7, 1931, and showed a balance of $4429.49.

It was in this year that the Association went on notice and no further dividends were allowed thereafter. Neither does the account show any further deposits or withdrawals.

This second book, marked Plaintiff's Exhibit 3, on the cover thereof is marked "Savings Account." The account was given a new number, to-wit, 20383. Nothing is claimed by the fact of the transfer of the account from book Exhibit 2 to book Exhibit 3. This change was occasioned through the installation of a Burroughs machine, through which the entries of the company's ledger sheets and the pass book of the customer were simultaneously made. This required a new book

so that the form and the spacing would be identical. In the first book, Exhibit 2, the entries were made by pen and ink.

Plaintiff's decedent's subscription for five shares of stock was presented in evidence as Defendant's Exhibit A. This purported subscription appears on a card slightly smaller than the ordinary postal card. At the top of the card appear 3¼ lines of printed matter, covering the subscription, with a blank space left for number of shares. This reads as follows:

"I hereby subscribe for 5 shares of stock of The Miami Loan and Building Association of Dayton, Ohio, subject to the Constitution, By-Laws, Rules and Regulations of said Association; and I hereby agree to and authorize the increase of said shares from time to time, as provided for in section 13 of the By-Laws of said Association."

Immediately thereunder appears the signature, Geo. F. Woodson, immediately above the residence, Wilberforce, Ohio. To the right of the signature appears, stamped, 16582. These are the identical figures stamped on the running stock book given to Mr. Woodson. Near the bottom and to the right appears the stamped date, April 10, 1922. This is the identical date stamped in the original running stock book given to Mr. Woodson.

The evidence discloses that no stock certificate was ever issued to Mr. Woodson, either for five shares or any other amount. The running stock account as contained in book Plaintiff's Exhibit 2, discloses no effort to equal the five shares subscribed for with $500.00. The first four deposits, the last of which was December 7, 1922, and including dividend under date of June 30, total $451.73. The next deposit, dated December 18, was $250.00, and this month totalled up to $701.73. The account continued in regular form as a running stock account, the same as though no signed subscription had been made. This was the usual method and the evidence disclosed that many, many customers of the Association carried their accounts as running stock accounts, and never had stock certificates issued to them even though they had subscribed for a designated number of shares and the amount paid in exceeded the amount subscribed for.

Mr. Woodson being deceased, there was not present the usual evidence presented in other cases that the depositor had no intention of subscribing for stock or having a running stock account. So far as the record discloses Mr. Woodson

intentionally subscribed for five shares of stock and knowingly received a running stock pass book, which he had in his possession until the time of his death. The only way he would receive credit for dividend payments would be to take his book in and have the same entered therein. It is obvious this was done and in each instance where the amounts were marked dividend.

The only possible evidence intended to question Mr. Woodson's knowledge of the character of his deposits was that of his widow, the plaintiff administratrix. She testifies that after the Association was in liquidation, which probably was 1933, she went with Mr. Woodson to the Association and there contacted someone behind the counter, whom she did not know, had never seen before nor since, probably an employee either of the State or the Association. Mr. Woodson presented his book and said he wanted something paid to him on his account. The young man, whoever he was, took the book, went back to the desk where some other people were sitting, and apparently all conversed, but not audible to her. The young man came back and told Mr. Woodson that he was a stockholder and that he could not get anything. Quoting literally from the testimony, Mrs. Woodson said that her husband's reply was: "He said that was the first time he had known that." Nothing further was said. This could be nothing more than a self-serving declaration and would have no probative force.

Under the state of the record we have no difficulty in determining that plaintiff is not entitled to any relief. Neither do we have any difficulty in determing that the Busch case, supra, is readily distinguished in its facts from the instant case.

In the Busch case it appears that when the plaintiff Busch was eleven years of age his mother took him down to the Association and made the first deposit in the sum of $1.00, receiving a pass book in which the amount was entered. This account was given No. 5070, and admittedly was a special deposit. The deposits continued in varying amounts, with some withdrawals, until the book was filled, the last deposit being made December 30, 1922, then totalling $2899.00. There was a stamp on the last page of the book, opposite the total, indicating that an audit was made in January, 1923. It is further admitted that at all times the account in this book was a special deposit account. The books of the Association disclose that on January 18, 1924, the account was transferred to a running stock account, the amount of the deposit being $3181.-

17. Following the filling up of special deposit No. 5070, the later pass books were not in evidence until No. 649, the first deposit in which is dated January 30, 1930. In the interim between June 1920 and 1930 there probably were one or two pass books, but they could not be found. The plaintiff Busch says that he had one which was turned back to the Association when he received his present book in January 1930. Pass book No. 649 was not labeled "running stock account." but "savings account". The legend "savings account" might mean either running stock account or special deposit. There was no evidence that the missing books between 1920 and 1930 were labeled running stock account. The only entry in book No. 649 which might in the slightest degree bring home to plaintiff Busch that his account was being carried as a running stock account was the abbreviation "div." after one single item.

The defendant Association introduced in evidence what purported to be a signed subscription by Mr. Busch for ten shares of stock, dated January 18, 1924. His special deposit account at that time amounted to $3181.72. The books of the Association disclose that on this same date it transferred the entire balance in Mr. Busch's account to a running stock account. No evidence was presented that plaintiff Busch was advised of this method of carrying the account on the books of the Association. Of course, Busch would not be bound by the books of the Association unless the fact that it was being carried as a running stock account was brought home to him. The supporting evidence introduced by the Association was that on the same date that Mr. Busch subscribed for ten shares of stock of the Association a check was issued to himself for his entire balance, and endorsed in blank. It was argued that this was sufficient to advise plaintiff Busch that his entire balance was being transferred to a running stock account. It was our conclusion that this signing of the check and endorsing it in blank might have been understood by the plaintiff as their method of placing to his credit the subscription for ten shares of stock. We were unable to understand why there was a subscription for ten shares of stock only, if it was the intention of the parties to transfer the entire account to a stock account. The plaintiff Busch, as heretofore stated, admittedly had a special deposit account of $3181.72. A subscription for ten shares would amount to $1000.00, which would leave $2181.72 in the special deposit account. It must also be remembered that the plaintiff Busch testified that he never intended to subscribe for any stock, and while the subscrip-

tion card contained his signature he thought he was placing his name thereon for identification purposes. He had no re-collection whatever of receiving the check, but admitted the endorsement. We held that he would be bound for the amount of his subscription on the well recognized principle of law that there is the obligation of people to read and understand documents before they sign them.

It is argued that because Mr. Busch received the check for the full amount and endorsed it back to the Association, that this presented a similar factual situation to the instant case. Statement is made that he might have cashed it, taking the money to some other institution, or used it in any manner or method that he saw fit. Under the facts of the Busch case we doubt this reasoning, although admitting that depositors might withdraw their money at any time. We are not dealing with what plaintiff Busch might have done, but what was done, and in the light of the testimony of plaintiff Busch, that he had no recollection of ever having received or endorsed the check in question, it was our conclusion that it was nothing more than the Association's method of reconciling the account following the subscription for ten shares of stock.

This was the situation that prompted us to say that it required some affirmative action upon the part of Busch to transfer the balance in his special deposit account to a running stock account.

We are unable to determine from the record in its entirety that Busch changed his special deposit account except as the same would be changed through his subscription for ten shares of stock. Neither would the record as a whole warrant the conclusion that plaintiff Busch knew that the balance of his special deposit account was transferred to a running stock account. No evidence that his pass books so showed.

How different are the facts in the instant case? Plaintiff's decedent Woodson never had anything but a running stock account. His first business relation with the Association was a subscription for five shares of stock and receiving of a pass book marked "running stock," and on the same day making a deposit of $100.00. The character of the deposit this day made was never changed and continued in the same status until his death. If at any time he had held the account as a special deposit, then under similar facts the Busch case might be applicable.

Had the Association at any time arbitrarily made a transfer of Mr. Woodson's account from a running stock account

and without any authority so to do, we could very properly say under such a situation that the Association had no authority to make such a transfer, except on some affirmative action by the owner and holder.

The expression "affirmative action," as used in the Busch opinion refers to a status. The business relations between the parties create the status. Neither party would have a right to change that status except by affirmative action. Of course, acquiescence or estoppel might intervene, even though there was no original affirmative action, but the question of acquiescense or estoppel was not a controlling element in the Busch case.

The petition of the plaintiff will be dismissed and costs adjudged against the appellee.

HORNBECK and GEIGER, JJ., concur.